## FITCH *vs.* ARCHIBALD.

1. If the report of a referee is unsupported by the evidence before him, or if the referee must have contravened some rule of law in reaching his conclusion, the report should be set aside; but if it is not against the evidence in the cause, and no rule of law has been violated, it should stand.

2. The report of a referee is entitled to the same weight as the verdict of a jury upon the facts in the case.

3. If the purchaser of goods, with full knowledge of their condition, voluntarily receives them from a ship, and pays the duties on them, he cannot afterwards set up that the goods were not of a merchantable quality.

4. F. agreed in writing to take of A. all the barytes he might deliver at Jersey City during that season, and pay therefor twelve dollars per ton. *Held* that, under the agreement, F. was entitled to have a merchantable article, and parol evidence could not be given to show that any particular lot or quality of barytes was intended.

5. Where there is any doubt about the identity of the article agreed for, parol evidence may be given to identify it, but where the agreement is for a certain or uncertain quantity of a known article of merchandise, parol evidence will not be received to show that it was to be of a certain kind or quality.

6. Where merchandise is sold to be delivered at a particular place free of charge, the vendee may pay any duties due thereon to the government and which are required to be paid before delivery of the goods, and may deduct the same from the purchase money due the vendor.

On rule to set aside report of referee.

Argued before WHELPLEY, Chief Justice, and Justices OGDEN and VAN DYKE.

*Bradley,* for plaintiff.

*I. W. Scudder* and *Williamson,* for defendant.

WHELPLEY, C. J.    If the report is unsupported by the evidence before the referee, or if the referee must have contravened some rule of law in reaching his conclusion, the report should be set aside.    But if the report be not against the evidence in the cause, and no rule of law has been violated, it ought to stand.

. The report is entitled to the same weight as the verdict of a jury upon the facts involved in the case.

The action was for the price of 150 tons of barytes, sold and delivered by the plaintiff to the defendant at $12 per ton.

The plaintiff gave credit for the freight paid by defendant, $450, and for cash on account, $600, claiming a balance of $750 and interest from November, 1856, at seven per cent. The referee allowed $750, with interest from 15th November, 1856, at seven per cent., $155.32, making in all $905.32.

Archibald was the owner of a mine of barytes, situate in Nova Scotia, near the Bay of Fundy. During the summer of 1856, he had lying on the shores of that bay a large heap of the barytes, which had remained subject to the flow of the tides for a long time, by which it had become mixed with sand and the mud and slime left by the tides, so as seriously to injure, if not destroy, its marketable value. The use to which the mineral was to be applied was the adulteration of paints, by mixing with them the mineral ground to an impalpable powder, which in that state was white.

Fitch, in connection with other parties, had rented works at Jersey City, for the purpose of grinding the mineral, at great expense, and was in great need of the mineral to put the works in operation. It was insisted, on the part of the plaintiff, and evidence given to sustain this insistment, that the parties met in New York during the summer of 1856, and negotiated concerning a sale of the mines; that Fitch wanted barytes immediately; that Archibald informed him he had suspended working the mines, and could not get out any of the mineral that season; that if what he had on hand would answer, he was ready to ship it at $12 a ton, also paying the freight; that Archibald suggested that Fitch should send some one to examine the property; that Fitch agreed to send one Keenan, who was in his employ, and said, that if he ap-

proved of it, he wanted it shipped immediately, as he was anxious to commence operations that winter; that Keenan went to Nova Scotia, saw the barytes on the shore in the state described, said it would do very well, and wanted it shipped immediately, saying it could be washed at Jersey City; that Keenan returned to New York, reported to Fitch, and that afterwards, on the 27th September, 1856, Fitch signed an agreement as follows: It is agreed between C. D. Archibald and A. J. Fitch, of Jersey City, as follows: the said Fitch agrees to take all the barytes the said Archibald may deliver at Jersey City during the present season, and to pay therefor the price of twelve dollars per ton ex ship; the vessel or vessels to be free of wharfage and dockage during delivery; to be paid in cash on delivery of the several cargoes. The barytes was shipped by Archibald, and delivered at Jersey City to Fitch, who received it, and paid the duties upon it, because, he says, the government insisted on his taking it. He says he tried to refuse taking it on account of its dirty state.

The defendant insisted that he was ignorant of the state of the article when he signed the agreement; that Keenan was not his agent, and had no power to agree to take the barytes, and never did agree to take it on his behalf; that Archibald sent him a sample of the article; that the barytes was to be as good as the sample; that after the barytes arrived he sent word to Archibald that it was worthless; that the barytes was of no value.

There was evidence to support the plaintiff's version of the facts, and also that of the defendant, both documentary and oral.

Keenan was there and examined the barytes, and brought a sample from the shore; and after his return the written contract was signed. On the 22d September, four days before the agreement was signed, and after Keenan's return and his report to Fitch, Fitch wrote a letter to Archibald, in which he said: Your favor of the

Fitch v. Archibald.

11th was received, and in answer, I want your barytes you have on hand. If we can make an arrangement on as favorable terms with you as we can with others we will give you the preference. If you come to New York I will call and see you. I do not intend to examine the evidence in the cause in detail, nor do I think it at all necessary for the decision of the case to do so.

The evidence in the case justified the referee in finding—

1. That Fitch, at the time he made the written contract, knew the state in which the barytes on hand was; that it was dirty, unfit to be shipped; that he relied on being able to wash it at Jersey City.

2. That he did not buy it by sample.

3. That Keenan was the agent of Fitch, sent to Nova Scotia to examine the mines and the barytes on hand, and to determine whether it was fit for the purpose of manufacture.

4. That Keenan pronounced it a merchantable article, and agreed that Fitch should receive it as such.

5. That the agreement was made with reference to the heap of barytes on the shore in its then state.

6. That Fitch received the barytes under the agreement, and paid the duties upon it voluntarily, for the purpose of enabling it to be delivered on the wharf at Jersey City.

There is a conflict of evidence upon these points; but I cannot say that the finding is so far unsupported by the testimony as to justify the court in setting it aside, even if it were necessary to support the report by an affirmative finding on all the points.

The defendant insisted that, by the terms of the agreement, the plaintiff was bound to deliver a merchantable article, and that the barytes delivered was not such; and also, that he was entitled, under the contract, to have the moneys paid for duties refunded under his set-off filed in the case.

By the defendant's own admission he was fully aware

of the condition of the article before he paid the duties upon it and permitted it to be landed. If he paid the duties on account of plaintiff, and with full knowledge of the situation of the barytes permitted it to be landed, he ought not now to be permitted to say that it was not merchantable.

But did the agreement require the delivery of a merchantable article? Is that its import as it stands? The writing may be read by the light of surrounding circumstances, in order more perfectly to understand the intent and meaning of the parties. No other evidence of the language employed by the parties than that used in the instrument is receivable. 1 *Greenleaf* 277; 2 *Cowen & Hill's Notes to Phillips' Ev.*, *note* 263 *to page* 293.

Where the writing does not clearly identify the subject of the agreement, surrounding circumstances may be resorted to to show what the parties referred to in the agreement; but where the contract is executory, requiring the delivery not of a certain article capable of identification from all others of the same kind, but of a certain or uncertain quantity of a known article of merchandise, parol evidence is not admissible to show that this quantity is to be taken from a larger quantity of the article of a certain kind, the property of a certain person or of a particular quality. To receive such evidence, or permit its application for such a purpose, would be to alter the contract in a most material point.

The effect of an agreement to deliver or receive 150 tons of barytes, is that the barytes must be of a merchantable quality. If it is not such, the vendee is not bound to receive it.

It will be perceived that the question would be, not whether the agreement should be void for an uncertainty or apply to a certain article of merchandise, but whether the merchandise should be of a certain quality or not, in short not a difficulty about identity but quality. It would be neither a case of patent or latent ambiguity, the agree-

Fitch v. Archibald.

ment being certain on its face and parol evidence creating no ambiguity. *Smith* v. *Jeffries*, 15 *Mees. & Wels.* 561.

That was an agreement to sell 60 tons of Ware potatoes at five pounds per ton ; it was held that it could not be shown that the plaintiff had in fact contracted for a particular kind of Ware potatoes, to wit, Regents, to arrive. If the defendant had refused to receive the barytes because it was not in a merchantable state, if it was in fact so, he might have successfully defended himself against an action for damages, unless he had, as before stated, precluded himself from so doing by his conduct in regard to the article shipped. *Howard* v. *Hoey*, 23 *Wend.* 350.

In all agreements to make sales of indeterminate things there is always a warranty implied that the indeterminate thing to be delivered should not have any remarkable defect, or, as it is sometimes said, should be merchantable. In such a case the maxim of the law is *caveat venditor ;* in case of executed sales of a thing *in esse* it is *caveat emptor.* *Smith's Mercantile Law* 508 ; *Chanter* v. *Hopkins*, 4 *Mees. & Wels.* 399 ; *Moses* v. *Mead*, 1 *Denio* 378 ; *Beninger* v. *Corwin*, 4 *Zab.* 257.

The agreement, by its terms, required the delivery of a merchantable article, and parol evidence was incompetent to show that the barytes to be delivered was to be of an inferior quality.

The defendant in this case claimed the duties paid by him as a set-off. Whether he can recover these or not depends upon the agreement. It is insisted that the agreement to deliver the barytes at Jersey City at $12 per ton, the vessels to be free of wharfage and dockage during delivery, to be paid for in cash on delivery of the several cargoes, imposed upon Archibald the obligation to do everything, to pay all charges prior to delivery while the property remained his. This is so. The duties, if any were demandable, were a charge on the barytes while it was the property of the plaintiff; without their payment he could not perform his contract.

The barytes was consigned to the defendant by the plaintiff; he supplied no funds with which to pay the duties; the consignment of them to the defendant was a request to pay them.

If the barytes had been consigned to defendant as a factor he might have pledged them for the payment of duties accruing on the goods. *Evans* v. *Potter*, 2 *Gallison* 12.

I am of opinion that the duties were a charge upon the plaintiff, and should have been allowed by the referee, and that for this reason the report should be set aside, unless the plaintiffs remit their amount, with interest from the time of payment.

VAN DYKE, J. This action was brought in this court, and after having been several times noticed for trial, it was, by consent, referred to Judge Nevius for his examination and report. The object of the action was to recover the value of 150 tons of barytes at the rate of $12 per ton. The referee reported in favor of the plaintiff for the whole of this claim, less the freight and less a payment of $600, which had been paid by the defendant on a draft drawn on him by the plaintiff, and accepted before the barytes was delivered.

Twelve dollars per ton seems to be the usual price for barytes of good quality and in merchantable condition, but the article in question seems to have been very far from this. The plaintiff himself says it had been lying on the banks of the Bay of Fundy two or three years, and had been overflowed by the tide during that time; that it had become comminuted and dirty with the mud and slime which the tide carried over it. His witness, Morrison, says that it was muddy and sandy, and in such condition that he advised the plaintiff not to ship it at all, as it would injure the reputation of the mines, while Fitch himself, and Gordon and Tresdale say it was in such condition as to be of no value at all, as it would cost more

Fitch v. Archibald.

to cleanse it than it was worth. With such an article of barytes as this, nothing can justify the report which has been made in favor of the plaintiff but a clear and explicit agreement on the part of the defendant to take such barytes at such a price, with a full and perfect knowledge, on his part, of the character and condition of the article which he was purchasing. It is conceded that the defendant had never seen the article himself until it was delivered, although he had seen a sample which was in a perfect state and was satisfactory, and of all this the plaintiff was aware. It is very clear, then, that the defendant, in person never made any such agreement with a knowledge of the condition of the barytes, and the remaining question on this branch of the case is, whether he ever authorized any other person to make such a contract. It is insisted, on behalf of the plaintiff, that the arrangement or agreement to ship the dirty barytes in question was made by Keenan, who, it is contended, was the agent of the defendant for this purpose; but the first difficulty in the way of this view of the case is, that the contract for the barytes, such as it was, was made by the defendant himself with the plaintiff in person, and was made at New York or Jersey City and reduced to writing, and is offered in evidence by the plaintiff himself. And this contract, the plaintiff says, was made after Keenan had been to see the barytes at New Brunswick, and after he had returned with his samples, and after Robinson had made a favorable report of the mines, all which seems to come in sad conflict with another part of the plaintiff's evidence, when he says that Keenan had made the agreement for the shipment of the barytes before he left the Bay of Fundy. The only evidence in the case which goes to show the agency of Keenan is that of the plaintiff, when stating the interview between him and the defendant, at which he says that the defendant said he had a man in his employ who had relatives in the vicinity of the barytes; that he was going there to see them, and he, the defendant, would get him to go and see the barytes.

The plaintiff seems to have understood the defendant as referring to Keenan, for he knew him; but it does not appear that the name of Keenan was mentioned by Fitch, or that he said a word about making him his agent in the matter, or that he would be clothed with authority to act in the premises; nor does it appear by any evidence that Keenan, at the mines, or at the Bay of Fundy, or elsewhere, either offered or claimed any agency or authority from the defendant to act in the matter, except that the plaintiff and Morrison say that when examining the barytes, he ordered it shipped immediately. And yet it was after all this, and after Keenan had returned with his samples, and after the plaintiff had written to the defendant, under date of the 11th of September, that the defendant, in reply to that letter, on the 22d of September, wrote the letter before us in manuscript, informing the plaintiff that he wanted the barytes, and if they could make an arrangement with him on as favorable terms as with others they would give him the preference, and inviting him to come to New York, showing that at this time, no agreement had yet been made. Five days after this the parties were together at New York, and the contract was made, reduced to writing, and signed by the defendant. It is also manifest enough that the article was never shipped till after the written contract with the defendant. The contract is dated September 27th. The plaintiff drew his first draft on the defendant on the 14th of October following, payable at three months, and on the 12th of November, or thereabouts, the cargo arrived at New York, the duties being paid on that day and the freight on the 19th. All this seems quite inconsistent with the idea that the arrangement for shipping was made early in September with Keenan, as the agent of the defendant, and that the barytes was shipped under his order and by his authority; but over and above all this difficulty in the way of the plaintiff, this whole view of the case is positively and totally denied by Fitch and Keenan, by Gordon and Tresdale, all denying that Keenan had any such

authority, or that he was employed on any such errand. That all he did or was authorized to do, was to procure samples, which he did. And the plaintiff himself says, at the close of his first examination, " I bargained with Fitch for the barytes ; all the terms were arranged with Fitch."

I cannot see, therefore, anything in the evidence to justify such an allowance for such barytes, and think the report in this respect is against the clear weight of evidence, and should, for this reason, be set aside.

The referee has allowed interest on the claim at the rate of seven per cent., which I think is wrong. It does not clearly appear where the parties were when the contract was made, though it seems probable they were in New York. The contract is not dated at any place. The only party to it, living in the county, and to whom the barytes was to be delivered in performing the contract, resides, as the contract says, in New Jersey, and by its terms it is to be performed and finished in this state, which would make the indebtedness, if any, carry but six per cent. interest.

I do not feel at liberty to say, as a matter of law, that the barytes possessed no value at all, or that the defendant, from the entire failure of consideration, should recover back the $600 advanced on the contract. These are matters of fact on which a jury should pass under a proper charge. Nor do I find it necessary now to say which of the parties should be required to pay the duties on the article. The written agreement is silent on the subject. The legal inference is, that the plaintiff should pay it ; but the evidence outside of the contract is very contradictory—the two parties who alone spake on the subject give directly different versions of the understanding between them. This question, also, I think, should be submitted to a jury to determine, if need be, on the whole evidence, on whom the obligation devolved.

Let the report of the referee be set aside, and a new trial granted or a new hearing had.

CITED in *Excelsior Carp. Lin. Co.* ads. *Potts,* 7 *Vr.* 302.